**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Aaron M. Lee, being first duly sworn, hereby depose and
state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.   I make this affidavit in support of an application under
Rule 41 of the Federal Rules of Criminal Procedure for a search
warrant authorizing the examination of one black backpack, one
blue phone, one silver and yellow phone, one Apple iPad with serial
number DMPWDS5JF88, one black Acer laptop computer with serial
number NHQ96AA0040240C8F23400, further described in Attachment A,
which are currently in law enforcement possession, and the
extraction from that property of electronically stored information
described in Attachment B.

2.   I am a Special Agent employed by the United States
Department of Justice in the Federal Bureau of Investigation
("FBI"), and as such I am a "federal law enforcement officer"
within the meaning of Fed. R. Crim. P. 41(a)(2)(C) authorized to
apply for federal search warrants.

3.   I have been employed as a Special Agent of the FBI since
January of 2019.  I am currently assigned to the FBI Charleston
Resident Agency, Charleston, West Virginia. During my employment
with the FBI, I have been involved in several investigations,
including investigations into complex financial crimes, possession

1

and distribution of controlled substances, and matters of national security. As part of my duties with the FBI, I investigate violations of federal law, including offenses enumerated in Title 18 U.S.C. § 1343. I have been the affiant on search warrants, and personally participated in search warrants and making arrests.

4.    Prior to working for the FBI, I was employed as a Correctional Officer in the West Virginia Division of Corrections and Rehabilitation and the Federal Bureau of Prisons for more than three years. During my time as a Correctional Officer, I conducted searches for contraband and investigated violent crimes occurring within West Virginia prison facilities.

5.    I have not included every fact known to me that relates to this investigation. Rather, I have set forth only those facts necessary to establish probable cause to believe that evidence of violations of federal criminal law, as more fully set forth herein, is contained at the location identified in Attachment A to the Application for a Search Warrant.

6.    Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18 U.S.C. § 1343 (wire fraud), § 1348 (securities fraud), § 371 (wire fraud/securities fraud conspiracy); § 1349 (wire fraud/securities fraud conspiracy), Title 15 U.S.C. §§ 77e(a), 77e(c) and 77x (sale of unregistered

securities), and Title 18 U.S.C. §§ 371 and 1512 (conspiracy to obstruct justice) ("Subject Offenses") have been committed by MILLER. There is also probable cause to search the property described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

**TARGET OBJECTS**

7.    The property to be searched includes one black backpack, one blue phone, one silver and yellow phone, one Apple iPad with serial number DMPWDS5JF88, one black Acer laptop computer with serial number NHQ96AA0040240C8F23400 (**"TARGET OBJECTS"**) believed to belong to Theodore MILLER ("MILLER"). The **TARGET OBJECTS** are currently stored at 113 Virginia Street East, Charleston, West Virginia 25301, located in the Southern District of West Virginia. The information to be searched is further described in Attachment A incorporated with this affidavit. The FBI will search the **TARGET OBJECTS** for the items more particularly described in Attachment B that constitutes evidence of the Subject Offenses.

8.    The **TARGET OBJECTS** are currently in the lawful possession of the FBI.

9.    On information and belief, on or around August 9, 2024, after MILLER was arrested, Deanna Drumm ("Drumm") and MILLER's wife Fatima Condezo ("Condezo") took the **TARGET OBJECTS** from

3

Drumm's home in Charleston, West Virginia to Drumm's mother's home in Michigan to conceal the items from law enforcement. Drumm stored the **TARGET OBJECTS** in a closet in her mother's basement. At some point before September 17, 2024, Drumm had a conversation with her eldest son regarding the **TARGET OBJECTS**, and as a consequence, her son instructed Drumm's mother to ship the **TARGET OBJECTS** to Drumm's attorney in Charleston, West Virginia.

10. On September 17, 2024, the FBI met with Drumm at her attorney's office. Drumm and her attorney gave the FBI consent to search the shipped packages and to seize the **TARGET OBJECTS** that were contained therein. Drumm's investigator unpacked the **TARGET OBJECTS** from the shipment packaging in the presence of the FBI. Drumm stated that the **TARGET OBJECTS** belong to MILLER and that the computer was used in furtherance of his businesses.

11. Immediately thereafter, the FBI transported the **TARGET OBJECTS** to its office at 113 Virginia Street East, Charleston, West Virginia 25301, and stored the **TARGET OBJECTS** there.

12. The applied for warrant would authorize the forensic examination and search of the **TARGET OBJECTS** for the purpose of identifying electronically stored data and other items particularly described in Attachment B.

4

**JURISDICTION**

13.  This Court has jurisdiction because the **TARGET OBJECTS** are located within the Southern District of West Virginia. Fed. R. Crim. P. 41(b)(1).

**TECHNICAL TERMS**

14.  Based on my training and experience, I use the following technical terms to convey the following meanings:

    **a.** *Wireless telephone*: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system technology for determining the location of the device.

    **b.** *Digital camera*: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media includes various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored

images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. *Portable media player*: Portable media player refers to a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can use removable storage media. Removable storage media includes various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as calendars, contact lists, clocks or games.

d. *PDA*: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

e. *Global Positioning System*: Global Positioning System ("GPS") refers to a navigation device used to display its current location. It often records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. GPS consists of twenty-four NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive

those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

    f. *Internet*: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

    g. *Computer*: Computer refers to any electronic, magnetic, optical, electrochemical, or other high speed data processing device capable of performing logical or storage functions and includes any data storage facility or communications facility directly related to such a device. As used herein, "computer" also incorporates digital devices that complete these same functions, such as smartphones, tablets, connected devices, and e-readers. See 18 U.S.C. § 1030(e)(1).

    15. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications, I know that some of the **TARGET OBJECTS**, namely the cell phones, the iPad and the computer, have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA, and allow them to access the Internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

16. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

17. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of Subject Offenses, but also forensic evidence that establishes how some of the **TARGET OBJECTS** were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on some of the **TARGET OBJECTS** because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that is necessary

to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

**PROBABLE CAUSE**

18.    The FBI initiated this investigation on March 14, 2023, based on a complaint it received from the West Virginia Securities Commission. The West Virginia Securities Commission reported to the FBI that MILLER was selling unregistered securities to the public.

BACKGROUND

19.    Based on information obtained from the West Virginia Department of Motor Vehicles, MILLER is a United States citizen and is a permanent resident of 4607 Normar Road, South Charleston, West Virginia 25309, which is in the Southern District of West Virginia.

9

20.  Upon information and belief, MILLER frequently travels internationally and has remained outside the United States for much of the duration of this investigation.

21.  Based on publicly available information, MILLER owns and operates numerous businesses registered in the State of West Virginia including, but not limited to, Bear Industries LLC ("Bear Industries"), Prestige Worldwide Real Estate LLC ("Prestige"), T&C Construction LLC ("T&C"), Bear Investments and Business Consulting, LLC, Blue Steel Modeling Agency LLC, and Stark Industries LLC.

22.  Based on publicly available information, Bear Industries is a single-member limited liability company registered in the State of West Virginia. Its sole member is MILLER.  Its business address is 134 Huntington Street, Saint Albans, West Virginia 25177. Bear Industries is also associated with the address 1007 Bigley Avenue, Charleston, West Virginia, 25302.

23.  MILLER controls a real estate investment program, "Bear Lute," (hereinafter the "Bear Lute Program") which is affiliated with Bear Industries. As part of the Bear Lute Program, investors give MILLER money to invest in real estate properties on the promise that they will achieve an extraordinary rate of return over a period of months or years. The Bear Lute Program is administered through bearlute.com, as detailed herein.

24.    MILLER also solicits and obtains investments in specific real estate projects, "direct investments," that fall outside of the scope of the Bear Lute Program.

25.    MILLER communicates with employees and contractors for Bear Industries, investors, and potential investors using the Internet, primarily through his email accounts, including but not limited to teddy@bearindllc.com and theodore.miller41@gmail.com.

26.    DRUMM is MILLER's mother, who is an active participant in MILLER's businesses. In particular, she holds herself out as the Vice President of Bear Industries. DRUMM regularly manages the finances of Bear Industries, signs documents, facilitates business deals and transactions, and handles business communications with investors on behalf of the Bear Lute Program, all from the Southern District of West Virginia.

27.    DRUMM communicates with MILLER about the Bear Lute program and about MILLER's finances and businesses using the email address deanna@bearindllc.com.

28.    West Virginia Department of Motor Vehicle Records show that DRUMM resides at 4607 Normar Road, South Charleston, West Virginia 25309, which is in the Southern District of West Virginia.

29.    At all relevant times, MILLER maintained bank accounts with Fifth Third Bankcorp ("Fifth Third"), which is an FDIC-insured bank headquartered in Cincinnati, Ohio, with branches throughout

11

the Southern District of West Virginia, including Charleston, Kanawha County, West Virginia. Fifth Third is a "financial institution" as defined by 18 U.S.C. § 20.

30. In particular, MILLER maintained a bank account ending in 5311 in the name of Bear Industries at Fifth Third and a bank account ending in 5154 in the name of T&C Construction at Fifth Third. These bank accounts are held in Charleston, Kanawha County, West Virginia.

31. Between June 2022 and September 2022, bearlute.com used Paypal to process payments for the Bear Lute Program. The funds during this time were deposited into MILLER's account ending in 5154 in the name of T&C Construction.

32. Paypal is headquartered in San Jose, California, and it does not maintain servers in West Virginia.

33. For much of the time relevant to this investigation, MILLER travelled abroad extensively and documented his travels on his social media to reinforce the public's perception that he was very wealthy.

THE BEAR LUTE PROGRAM

34. The Bear Lute Program is a pooled investment vehicle operated by MILLER. MILLER promises investors that he will take their funds and invest them in real estate, and that the investors will enjoy, on average, a 20 percent return on investment. MILLER

advertises that the Bear Lute Program is safe and secure; he tells investors that their money is personally guaranteed by MILLER and that they can withdraw their funds at any time. He promises that the funds will be returned within 60 days of a withdraw request.

35.    MILLER primarily promotes the Bear Lute Program through social media, where he has gained a following. He maintains a social media presence on TikTok, YouTube, Instagram, and Facebook. On these platforms, he regularly posts videos and other information promoting the Bear Lute Program and directing viewers to bearlute.com. His social media platforms are accessible via the Internet on a cell phone, tablet, and computer.

36.    Based on my review of emails, at all relevant times, in general, an investor would become interested in the Bear Lute Program by viewing one of MILLER's social media posts. The investor would correspond with MILLER via email and agree to sign up. DRUMM would then send the investor contracts through Docusign, which is an online document signature program accessible from a cell phone, tablet, and computer. The potential investor would sign the documents, and DRUMM would process his or her payment with a third-party payment processor: Paypal or Stripe. The money would be deposited into either T&C Construction's bank account or Bear Industries's bank account, both held at Fifth Third. The investor

would be given access to an investor dashboard by either MILLER or DRUMM, where the investor could watch his or her investment "grow."

37. Based on my review of bank account records and emails, I estimate there are more than 100 investors in the Bear Lute Program.

38. MILLER used electronic devices to conduct business related to the Bear Lute Program. Indeed, much of the evidence analyzed to-date has been generated using computers and transferred using the Internet, which is accessible from cell phones, tablets, and computers.

39. Most notably, the Bear Lute Program has a website bearlute.com, which is accessible via the Internet and on electronic devices such as cell phones, tablets, and computers.

40. As of September 20, 2024, bearlute.com contained the following representations regarding the program and MILLER, among others:[1]

    a. "Our founder Teddy Miller started the company mid 2018 as a side business to create passive income in addition to his construction company and other businesses. At first he was very skeptical, and had no idea he had just created something that would eventually change his life." (https://bearlute.com/about-us/)

    b. "Bearlute is an investment product of Bear Industries designed to essentially allow everyday individuals

---

[1] Quotations from bearlute.com have not been altered unless noted. Typographical and grammatical mistakes are original to the website.

14

to become the bank and lend money to Bear Industries for their real estate projects. Which consist of rebuilding abandoned and distressed properties into modern and affordable rental property that is designed to turn an incredible profit while also making a difference in the community around it." (https://bearlute.com/)

c. "Bear Industries is a real estate development company that operates throughout the United States specialize in the rebuilding of abandoned and distressed properties into affordable, modern rental property to either be held or sold for a profit." (https://bearlute.com/about-us/)

d. "Bear Industries has holdings in multiple locations, produces several million in annual revenue, and 20% of their current funding comes directly from investors. Who have been extremely happy with their success with this company." (https://bearlute.com/about-us/)

41. As of September 20, 2024, the "How it Works" section of bearlute.com outlined the steps for the Program (https://bearlute.com/how-it-works/):

a. First, investors "SIGN UP AND DEPOSIT FOUNDS[.] You can choose from one of your standard investment plans or choose to invest a lump sum into your account."

b. Second, investors "START EARNING INTEREST[.] From the moment you deposit funds into your account you will start earning 6% annum interest which will be deposited monthly into your account."

c. Third, investors "RECEIVE QUARTERLY GIFTS[.] Every 3 months you are eligible to receive a gift based on the average balance of your account and the profitability of our projects in that time."

d. Fourth, investors "REINVEST YOUR PROFITS TO MAKE MORE MONEY[.] All interest and gifts are automatically accrued and put to work making you additional profit unless you opt to receive them."

15



42. As of September 20, 2024, bearlute.com promised consistent standard returns, that the investment was "safe and secure," and that funds would be returned within 60 days upon request.

43. As of September 20, 2024, bearlute.com explained that after an investor invests in the Bear Lute Program, he or she will "be given exclusive access to your investment portal" where the investor can "Track Your Deposits[;] Track Your Interest Payments[;] Track You Quartely Gifts[;] Monitor Your Current Investment Performance[;] Monitor Your Expected Annual Return[;] Adjust your Investment Plan[;] Access Exclusive Direct Investment Opportunities for Bear Investors to Make More Money[;] And so much more!" (https://bearlute.com/exclusive-access/)

16



44.  As of September 20, 2024, bearlute.com contained several "Sign Up" buttons that directed visitors to bearlute.com/signup.



45.  Bearlute.com/signup    contained    the    following representation: "Let's Build a Fucking Empire!!! By Signing up for BearLute.com You Are Agreeing To Essentially Become The Bank For Teddy Miller's Real Estate Development Company Bear Industries, LLC In Exchange For a Cut of His Profits From Rebuilding Properties Around The United States." Investors could choose between

17

different investment packages and could invest money directly by using an online payment system.



46. As of September 20, 2024, bearlute.com's associated Terms of Service page (https://bearlute.com/terms-and-conditions-2/) provided that investors' "membership includes access to an exclusive server for you to monitor your account, adjust your monthly deposits, request a withdrawal, and see your projected annual return based on your current settings." It also provided that "Every Withdraw From BearLute.com is processed and completed within 60 days following the initial request. This is due to your

18

funds being used in active projects, and it takes time to reallocate the cash without stalling a projects completion."

47.    Upon information and belief, at all times relevant to this affidavit, bearlute.com maintained representations substantially similar to or the same as those noted above.

48.    Bearlute.com has been intermittently unavailable since August 8, 2024.

DIRECT INVESTMENTS

49.    In addition to the Bear Lute Program, MILLER has solicited and obtained investors in "direct investments."

50.    For a direct investment, MILLER solicits an investment in a specific income generating property that he will either rehabilitate or construct a structure upon. Investors are promised the return of the initial investment plus more when the construction is complete, and the project is refinanced. After, investors share in any rental income from the property.

51.    MILLER advertises direct investments to his investors in one-on-one communications, ordinarily via e-mail and telephone. He shares investment materials via email and Google Drive links, both of which are accessible on a cell phone, tablet, and computer. Further, promotional materials for the direct investments were created digitally using an electronic device, most likely a computer.

THE VICTIMS

52. **Victim C.T.:** In June 2022, after viewing a TikTok video of MILLER advertising a direct investment opportunity for the construction of a secure dry-storage lot located at 1017 and 1019 Bigley Avenue, in Charleston, West Virginia, victim C.T. reached out to MILLER via email to inquire about investing.

53. MILLER responded to C.T. and claimed that the project was "a great way to make a hell of a return, create passive income with the equity you retain, and start your journey to creating sustainable wealth" and included a promotional investor packet via Google Drive link, using an electronic device.

54. The promotional investor packet claimed that MILLER would rehabilitate a small dwelling and construct a dry-storage lot on the subject property. Construction of the dry-storage lot included clearing, leveling, and graveling the lot and installing a fence and security system. Once the project was complete, the property would be refinanced, and C.T. would receive his initial investment back, plus an approximate 23 percent return. After, C.T. and MILLER would share in the rental income from the dwelling and dry-storage lot. The packet represented that the "conservative ROI for year 1 was just under 20% with a cashout at the end of year 1 but residual passive returns in the following years."

55. After C.T. reviewed the promotional packet, he did some

of his own due diligence and discovered that the subject property was owned by Philco LLC. In a phone conversation, MILLER indicated to C.T. that he controlled Philco LLC.

56. Upon information and belief, MILLER has no ownership interest in or control over Philco LLC, and he never has.

57. On June 30, 2022, C.T. signed an "Investor Agreement" and a "Partnership Agreement" via Docusign to invest in the project.

58. The Investor Agreement provided that C.T. would give MILLER $20,000 for uses related to the Bigley Avenue property. MILLER would repay C.T. and C.T.'s wife $20,000 plus 15 percent of the refinance of the property on or before August 2, 2023. C.T.'s interest was secured by an interest in the property and the personal assets of MILLER.

59. The Partnership Agreement provided that Bear Industries and C.T. and C.T.'s wife were partners in a venture to rent the dwelling and dry-storage lot property located on Bigley Avenue in Charleston, West Virginia. Bear Industries would own 85% of the equity in the partnership and C.T. and C.T.'s wife would, together, own 15% of the equity in the partnership. MILLER signed the Partnership Agreement on behalf of Bear Industries.

60. On July 5, 2022, C.T. wired $20,000 to Bear Industries' Fifth Third account ending in 5311. The wire was sent by C.T. from

California. Once MILLER received the $20,000 wire in West Virginia in the Bear Industries LLC account ending in 5311, he transferred $4,000 of the funds to his personal bank account, paid employees, paid $5,266.64 toward a mortgage on a different property, and transferred approximately $9,000 to a separate bank account.

61. Upon information and belief, MILLER never owned 1017 or 1019 Bigley Avenue, Charleston, West Virginia. On July 27, 2022, MILLER entered into an owner-financing agreement to purchase part of the property, but MILLER became delinquent on payments by the spring of 2023 and never completed the purchase. Further, 1017 Bigley Avenue is not a valid address, according to the Kanawha County Tax Map.

62. In or around November of 2022, MILLER told C.T. that the project had slipped two months but that the lot would be open in 60 days. C.T. never heard from MILLER after December 2022, despite multiple attempts to contact him. To date, C.T. has not received his investment back.

63. On June 10, 2024, C.T. drove by the property on Bigley Avenue and noticed that the dry-storage lot had not been constructed.

64. **VICTIM Z.K.:** Victim Z.K. learned about investment opportunities with MILLER by viewing content on MILLER's Facebook and Instagram accounts. On or about September 16, 2022, Z.K.

invested $100 in the Bear Lute Program using the website bearlute.com. The $100 was processed by Paypal and deposited into MILLER's T&C Construction account ending in 5154.

65.    Shortly thereafter, DRUMM sent Z.K. an Investor Agreement and a direct deposit automated clearinghouse (ACH) form via DocuSign.  After signature, Z.K. received the completed documents via email from DRUMM.

66.    The Investor Agreement stated that "Bear-Lute" is "a product of Bear Industries of 1007 Bigley Avenue Charleston, WV." Under the terms of the Investor Agreement, "Bear-Lute" agreed to pay Z.K. the initial investment "plus an interest rate of 6% compounded annually" and "to return all funds due including accrued interest within 60 days of a written request." The Investor Agreement was electronically signed by MILLER using Docusign on August 31, 2022.

67.    On September 22, 2022, after Z.K. made his $100 investment, he received an email from MILLER with the subject "Welcome to Bearlute!" The email stated: "Hey Man, Welcome to Bear-Lute! Your personal portal can be found by accessing the Sign In Portion of https://bearlute.com/[.] Your Current Username is: [REDACTED] Your Password is: [REDACTED] Like everything we do at Bear Industries your portal will be ever evolving and will include additional features as time goes on! In your portal you can even

23

see your annual projected return based on your current deposit settings."

68. Thereafter, Z.K. used the Investor Dashboard to monitor his investment. It appeared to Z.K. that his investment was growing.

69. On or around May 3, 2023, Z.K. requested to cash out his investment through the online portal on bearlute.com. MILLER did not return the funds to Z.K.

70. Z.K. provided the FBI with a video of himself requesting a cash out in the Investor Dashboard through bearlute.com. In order to make the request, Z.K. entered his name, amount to be withdrawn, and reason for withdrawal before clicking "Submit."

71. As of the date of this affidavit, Z.K. had not received his investment back from MILLER.

OBSTRUCTIVE CONDUCT

72. Since his arrest on August 9, 2024, MILLER has communicated from South Central Regional Jail with DRUMM, CONDEZO, and his brother, David Otis. During a conversation with CONDEZO, MILLER complained about law enforcement's seizure of his phone during his arrest, and the two had the following exchange:

> CONDEZO: He get, he got his ass inside of the house, and got your phone and your shoes.
>
> MILLER: You know, I'm tempted to say that you guys should just report it stolen, on Apple, and at least lock it.

24

> CONDEZO: Huh uh honey, trust me, I was trying to do that, but I don't know your damn password. It's okay.
>
> MILLER: Okay, we are being recorded right now, so . . .
>
> CONDEZO: I know. I know.
> MILLER: **Look in my backpack.**
>
> CONDEZO: Yeah, yeah, yeah, I got it. Yeah, I got it. I know what to do.
>
> MILLER: Okay, and then after that, **make sure that that is, umm, not accessible.** Okay?
>
> CONDEZO: Mmm uh.
>
> MILLER: By anybody else.
>
> CONDEZO: Uhh huh.
>
> MILLER: Okay, now you've got the answer you needed, ha ha.

73.    In another conversation with CONDEZO, MILLER told her "[W]hat's in **my backpack** . . . is a copy of a lot of passwords . . . on Firefox . . . Just go there and look at passwords and it will tell you. Probably everything you are looking for." Firefox is an internet browsing application accessible through computers, cell phones, and tablets.

74.    Later,    MILLER    and    CONDEZO    had    the    following conversation:

> CONDEZO: I know, I know, but how I gonna get into your email?
>
> MILLER: From the thing in my **bag!**

CONDEZO: Uh huh.

MILLER: You understand that right? It's logged into all those things. That's all you gotta do. And then you just **do it quick and then make it, you know, hard to get to.** That's all I'm gonna say.

CONDEZO: Yeah. Except the backpack is, um, . . .

MILLER: Huh?

CONDEZO: Um, **it's safe, the backpack.** So, I can't have access to that.

MILLER: You can't?

CONDEZO: No. **It's safe.** It's, um, um, . . .

MILLER: But you can access it at some point and get the information you need, right?

CONDEZO: **At some point. At some point, yeah.**

MILLER: Well, that's kind of a problem for you cause it's got the information you need too.

CONDEZO: Yeah.

MILLER: Okay, well, it'll be okay.

CONDEZO: Yeah.

75. In conversations with DRUMM, MILLER told her to "hit the ATMs and stuff because you don't know if they are going to lock the accounts," "just be smart," and "keep your mouth shut."

76. On or about September 17, 2024, DRUMM told the FBI that the day after MILLER's arrest, DRUMM and CONDEZO gathered up multiple items to include the **TARGET OBJECTS** and drove them to

Michigan where DRUMM's parents live. DRUMM stored the TARGET OBJECTS at her mother's home and returned to Charleston, West Virginia.

77.  At some point prior to September 17, 2024, DRUMM's mother was instructed to ship the **TARGET OBJECTS** to her attorney located within the Southern District of West Virginia. DRUMM provided the **TARGET OBJECTS** to the FBI on September 17, 2024.

78.  Based on the totality of the facts furnished to your affiant, your affiant believes there is probable cause to conduct a full forensic analysis and search of the **TARGET OBJECTS** to search for evidence of the Subject Offenses.

NATURE AND MANNER OF EXECUTION

79.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

80.  Because this warrant only seeks permission to examine devices and search items already in law enforcement's possession, the execution of this warrant does not involve the physical

27

intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

**CONCLUSION**

81.  I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **TARGET OBJECTS** described in Attachment A to seek the items described in Attachment B.

Respectfully submitted by:

Aaron M. Lee, Special Agent
Federal Bureau of Investigation

Signed and sworn to by telephone this _____ day of September, 2024.

HONORABLE DWANE L. TINSLEY
UNITED STATES MAGISTRATE JUDGE